UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARIA T. TAPIA,

        Plaintiff,

v.                                                               Case No. 11-C-970

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

**DECISION AND ORDER**

This is an action for judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying Plaintiff Maria T. Tapia's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (the Act). 42 U.S.C. §§ 402(e), 1381. For the reasons that follow, the Commissioner's decision will be remanded.

**BACKGROUND**

Plaintiff filed applications for DIB and SSI on October 16, 2007, alleging disability since April 1, 2007. After her application was initially denied and on reconsideration, Plaintiff requested an administrative hearing. The administrative law judge (ALJ) held a video hearing on April 16, 2010, at which Plaintiff, who was represented by counsel, and a vocational expert (VE) testified.

The medical history is as follows. Plaintiff injured her back at work on August 18, 2006 while lifting a bucket of ice. (Tr. 226.) Plaintiff initially treated with a chiropractor who gave

Plaintiff work restrictions limiting her to sedentary work and lifting no more than five pounds. (Tr. 302–307.)

Plaintiff first saw pain specialist Dr. Brenda J. Dierschke, M.D., on January 23, 2007, at which time Plaintiff stated pain was present in her low back, buttocks and legs. (Tr. 226.) She confirmed difficulty sleeping due to the pain. (Tr. 227.) Dr. Dierschke issued work restrictions, limiting Plaintiff to 6 hours per day, lifting no more than 5 pounds, and being allowed to work at her own pace and change positions as needed. (Tr. 228.) Plaintiff reported to Dr. Dierschke on March 9, 2007 that working was increasing her symptoms; her work was reduced to 3 hours per day, 3 days per week, but her pain continued to worsen. (Tr. 232, 235.) In May, this was further reduced to 2 days per week, 3 hours per day. (Tr. 236.)

A March 15, 2007 MRI of Plaintiff's spine showed a posterior disc bulge with an annular tear at L4-5. (Tr. 231.) On March 25, 2007, another MRI revealed mild spinal stenosis at L4-5, which had progressed. (Tr. 236.) Plaintiff reported Ultram caused dizziness and Tramadol and morphine did not significantly improve pain and made her feel "sick, nauseated, sedated, and dysfunctional." (Tr. 229, 367.)

In April 2007, Dr. Sridhar Vasudevan, M.D., performed an independent medical evaluation in regards to Plaintiff's worker's compensation claim, in which he concluded Plaintiff's work related injury was a muscular strain of her back that had healed by February 16, 2007. (Tr. 274–83.) Meanwhile, Dr. Dierschke prescribed steroid injections for Plaintiff's back pain. (Tr. 234, 237, 241.) Dr. Dierschke noted a stiff gait, and Plaintiff leaned away from her right side and shifted from side to side to avoid pain. (Tr. 235.) In July 2007, Plaintiff stated her pain symptoms were worse with prolonged sitting, and even though she was not working, she continued to rate

pain at an 8/10. (Tr. 238.) Plaintiff noted numbness in her feet. (*Id.*) Plaintiff noted side effects of Lyrica in an August 14, 2007 appointment with Dr. Dierschke, stating the medication caused numbness in her fingers and tongue and did not seem to help with pain. (Tr. 242.) In February 2008, Plaintiff stated she had been on gabapentin in the past for pain, but it "caused a lot of nausea, vomiting, and swelling of her face and eyes." (Tr. 372.) Plaintiff also stated oxycodone was causing constipation and nausea. (Tr. 441.)

Plaintiff also received treatment from psychiatrist Dr. Carlos S. Castillo, M.D. (Tr. 367.) Dr. Castillo diagnosed Plaintiff with major depression, single episode and assigned a GAF of 50. (Tr. 369.) Dr. Castillo noted: "The patient continues to report ongoing impairments with respect to her back pain, with respect to not being able to work, with respect to not even doing chores at home, with respect to restrictions with going out and doing things, with respect to ongoing suffering with the pain." (Tr. 360.) Plaintiff reported significant sleep disturbances and insomnia. (*Id.*) Plaintiff informed Dr. Dierschke that while sleeping medication did help, she did not "tolerate" it. (Tr. 244.) In October 2007, Plaintiff explained she has difficulty sleeping because of the pain and that she was also experiencing bladder symptoms. (Tr. 248.) Because of the ongoing symptoms, Plaintiff was interested in surgical options. (Tr. 244) An MRI in early 2008 showed "early degenerative disc and degenerative facet change." (Tr. 502.) Dr. Randall R. Johnson, M.D., Ph.D., a neurosurgeon, examined Plaintiff and found surgery would not help alleviate pain. (Tr. 856.)

Pursuant to Plaintiff's claim for benefits, on February 14, 2008, a non-examining state agency physician completed a residual functional capacity (RFC) form and found Plaintiff capable

of light work. (Tr. 374–81.) On the same date, a non-examining psychologist found no severe mental health impairment. (Tr. 607–18.)

In March 2008, Dr. Dierschke prescribed a TENS unit. (Tr. 441–42.) In May 2008, Plaintiff noted "ongoing symptoms in the low back area and right buttock area." (Tr. 447.) Both physical therapy and pool therapy made symptoms worse. (*Id.*) Plaintiff continued to receive injections for pain control, which she stated provided only brief relief and caused abdominal cramping. (Tr. 455–57, 485.) Dr. Dierschke recommended investigation of a spinal cord simulator, but the insurance company refused to cover the cost of the stimulator. (Tr. 464, 707.)

Dr. Thomas Leonard, M.D., performed a consultative examination for SSA on August 30, 2008. (Tr. 397–402.) Dr. Leonard documented limited mobility and walking at a slow pace with short steps, and use of a cane, which he did not believe was necessary. (Tr. 400.) Dr. Leonard noted Plaintiff's depression and that "she was literally in tears during the last half hour of our attempted physical exam." (Tr. 399.) Dr. Leonard opined Plaintiff had no limitations in regard to sitting, but Dr. Leonard also noted Waddell's signs. (*Id.*) He believed she could carry 5–10 pounds and handle objects without a problem. He concluded his report by opining, "I think traveling might be a challenge for the claimant because of her problem with prolonged standing and prolonged walking." (Tr. 401.) Giving this opinion great weight, a second non-examining physician, Dr. Robert Callear, M.D., found Plaintiff capable of only sedentary work on September 9, 2008. (Tr. 403–410.)

The next day, Dr. Richard F. Rider, Psy.D., performed a psychological evaluation, at which he noted Plaintiff's "anhedonia, depressed mood, poor appetite, feelings of failure,

4

problems with concentration, and psychomotor retardation" as well as insomnia and fatigue. (Tr. 489.)

On September 17, 2008, Plaintiff disclosed she was having urinary stress incontinence which had been ongoing but recently started causing problems. (Tr. 479.) Plaintiff was placed on Sanctura for overactive bladder. (Tr. 497.) Physical therapy for the urinary incontinence did not help because Plaintiff said her pain prevented her from being able to perform exercises. (Tr. 499.) Plaintiff received a transurethral contigen injection to help with her urinary incontinence. (Tr. 693.)

Plaintiff described her pain to Dr. Castillo as getting worse near the end of 2008, including trouble lying in bed for long periods, sitting and walking. (Tr. 505.) In January 2009, Plaintiff began wearing a brace for the back pain. (Tr. 503.) Dr. Castillo reported, "She is not walking well. She has to have this cane with her all the time. . . . The patient can hardly walk." (Tr. 503.) Dr. Castillo also documented his observation of Plaintiff's difficulty walking in the parking lot. (*Id.*) A March 2009 MRI showed minimal degenerative disc disease at L4-S5, with no significant changes since the prior MRI. (Tr. 526.) Plaintiff continued to experience pain in the low back, right buttocks and right leg. She also developed tightness in her shoulder blades, numbness in her toes and tingling in her face and neck. (Tr. 510, 590, 596.) Meanwhile, because of the stress urinary incontinence, Dr. Wen T. Yap, M.D., performed surgery on October 15, 2009. (Tr. 678.)

On October 19, 2009, Dr. Concepcion E. Santillan, M.D., performed a neurological consult on Plaintiff due to "pain all over." (Tr. 596.) Dr. Santillan concluded there was no neurological cause for Plaintiff's pain, and suspected Plaintiff had fibromyalgia. (Tr. 597.) On November 3, 2009, Plaintiff participated in an occupational therapy assessment with Sarah E. Wesolowski, OTR.

5

(Tr. 605–606.) The assessment found Plaintiff unable to lift from floor to waist, carry with two hands, push or pull, reach overhead, stoop, kneel, or crouch. (Tr. 605.) Plaintiff was able to sit for 2 minutes and 53 seconds, and was able to stand for 2 minutes and 15 seconds. (*Id.*) Wesolowski opined Plaintiff would not be able to safely stand or walk for work purposes, and would only be able to sit occasionally (i.e., less than 33% of the time). (Tr. 606.) Dr. Dierschke adopted these limitations and additionally found Plaintiff would need to shift positions at will, would be able to stand and sit for 15 minutes each before needing to change position, would require 6–8 unscheduled breaks throughout the workday, would need a cane to assist in walking, and would miss more than four days of work per month due to her condition. (Tr. 602–604.)

In December 2009, rheumatologist Mark E. Davis, D.O., confirmed Plaintiff's symptoms were compatible with fibromyalgia. (Tr. 651.) Plaintiff began noticing swelling in her hands and fingers and loss of strength around this time. (Tr. 658.) She continued to report little benefit from medications. (Tr. 659.) Ongoing counseling was suggested for Plaintiff; however, she was not comfortable needing to go through a translator and felt more comfortable talking with her psychiatrist, Dr. Castillo, who is bilingual. (*Id.*) In January 2010, Dr. Castillo noted Plaintiff, "came into the office walking slower than I have ever seen her before." (Tr. 770.) Dr. Castillo expressed hesitance to prescribe other anti-depressants due to Plaintiff's sensitivity to medication. (*Id.*) On December 8, 2009, Plaintiff participated in a vocational assessment with John J. Woest, MS, CRC, LPC, who found her to be "clearly unemployable." (Tr. 814–820.)

Despite the prior incontinence surgery, in February 2010 Plaintiff still had problems emptying her bladder and with urinary incontinence and was placed on another medication. (Tr. 777, 811.) Dr. Yap opined Plaintiff is incontinent all of the time, and would need 6–7 unscheduled

6

restroom breaks of 2–5 minutes each, plus one break per day to clean up and change due to accidents. (Tr. 793, 795.)

On March 1, 2010, Dr. Castillo opined Plaintiff was limited in her ability to deal with work stress, function without special assistance, maintain attention and concentration, maintain a satisfactory pace, respond to work place changes, and complete a normal work week without interruptions from psychologically based symptoms. (Tr. 825–26.) He opined Plaintiff would miss 2 days of work per month due to her symptoms and would need a 5–10 minute break every 30 minutes initially and 5–10 minute breaks every hour indefinitely. (Tr. 826–27.)

At the April 16, 2010 hearing, Plaintiff testified (with the assistance of an interpreter) that she hurt her back while at work in 2006. (Tr. 30.) She stated she has a lot of pain in her back, buttock, leg and foot. (Tr. 32.) She said she experiences pain all day and nothing takes the pain away. (Tr. 33.) She also testified she uses a cane to help her walk, because "[s]ometimes I have to stop because my left leg or foot doesn't move. And after a little bit, I can then continue on walking." (Tr. 38.) At the time of the hearing, she was taking about seven medications and some creams; she testified she had injections for pain in the past but they did not help. (Tr. 34.) Plaintiff testified she no longer drives because of the side effects of her medications, specifically, dizziness. (Tr. 20.) Plaintiff testified the surgery for her bladder problem did not help. (Tr. 39–40.) She stated she has to use the bathroom constantly and uses an adult diaper every day. (*Id.*) She wears long dresses so that the diaper and accidents are not as noticeable. (Tr. 41.)

Plaintiff testified she is a single mother of four children, and gets help from her sister, niece, and the older children. ( Tr. 19.) She testified she is a high school graduate and studied nursing and beauty. (Tr. 26–27.) She does not speak English but was enrolled in classes to learn it. (Tr. 26.)

7

Plaintiff testified she worked in the kitchen at the Radisson Hotel for 12 years. (Tr. 27–28.) She started out cleaning, then became a dishwasher, and finally worked on the buffet. (Tr. 28.)

Plaintiff testified she goes grocery shopping with her family but is unable to carry anything. (Tr. 24.) She thought she could comfortably lift about a pound and sit or stand for about 15 minutes, but her feet get numb and her back and arms hurt. (Tr. 38–39.) Plaintiff also testified to memory difficulties. (Tr. 40.) She often shows up for appointments at the wrong time or the wrong day. She relies on her son to help keep track of obligations. (*Id.*) In general, Plaintiff has difficulties getting dressed and carrying for herself. (*Id.*) The majority of the cleaning, including making the beds and cleaning the bathroom, is done by Plaintiff's son or sisters. (*Id.*)

The ALJ then questioned Vocational Expert (VE) Ronald Raketti about a hypothetical individual of Plaintiff's age, education, with the ability to work at the sedentary level, but who was limited to simple, routine and repetitive tasks, and allowed to be off-task 5% of the time, in a low stress environment. The VE testified the hypothetical person could not perform Plaintiff's past work, but jobs would be available for such person as hand packager and final assembler. (Tr. 48–49.) In response to questioning by Plaintiff's counsel, the VE testified if an individual could not sustain work activity for a full eight-hour day, no jobs would be available. (Tr. 49–50.) The VE further testified if the hypothetical person was required to sit and stand at will, take unscheduled breaks 6-8 times a day and miss four days of work per month, no jobs would be available. (*Id.*) Finally the VE testified if a hypothetical person needed "special assistance" it would constitute accommodated employment. (Tr. 51.)

In a decision dated May 21, 2010, the ALJ concluded Plaintiff did not meet the SSA's definition of disability. (Tr. 57.) The ALJ found Plaintiff had not engaged in substantial gainful

8

activity since April 7, 2007. (Tr. 62.) The ALJ found Plaintiff had the following severe impairments: depression and degenerative disc disease of the lumbar spine (20 C.F.R. §§ 404.1520(c) and 416.920(c)). At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that rendered her disabled. (Tr. 62–63.) The ALJ concluded Plaintiff had a residual functional capacity (RFC) to perform sedentary work with the additional limitations of only simple, repetitive tasks; the allowance of being off task five-percent of the day (in addition to normal work breaks); and only low-stress environments (i.e. only occasional decision making and only occasional changes in work environment). (Tr. 63–65.) With these limitations, the ALJ determined Plaintiff was not able to perform any past relevant work but that there were a number of jobs in the national economy she could perform, such as hand packaging jobs and assembly jobs. (Tr. 65–66.)

## STANDARD OF REVIEW

In reviewing an ALJ's decision, a federal court examines whether it is supported by substantial evidence. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and his conclusions. *O'Connor-Spinner*, 627 F.3d at 618 (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue*, 617 F.3d 923, 928–29 (7th Cir. 2010). "Rather than nitpick

9

the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.* The ALJ is also expected to follow the Agency's own rulings and regulations in making his determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).

**ANALYSIS**

Plaintiff contends the ALJ erred in three respects. First, she claims the ALJ's severe impairment determinations and RFC were not based on substantial evidence. Second, she argues that the ALJ improperly failed to give controlling weight to Plaintiff's doctors' opinions. Third, she contends the ALJ's credibility determination was not supported by substantial evidence. Each of these arguments will be discussed in turn below.

**1. Impairment/RFC Determinations**

Plaintiff first contends the ALJ's determinations of her severe impairments and RFC are not based on substantial evidence, as the ALJ ignored the diagnosis of fibromyalgia and did not properly evaluate evidence of Plaintiff's stress urinary incontinence. (Pl. Br. at 9.)

Meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. *See, e.g.*, *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 392 (7th Cir. 1992) (failure to discuss claimant's testimony, his wife's affidavits, or the reports of three doctors); *Look v. Heckler*, 775 F.2d 192, 195 (7th Cir. 1985) (failure to discuss uncontradicted evidence consisting of claimant's and friend's testimonies as well as medical reports); *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th

10

Cir. 1984) (failure to discuss subjective complaints of pain supported by medical statements). The ALJ's decision must be based upon consideration of all the relevant evidence and the ALJ "must articulate at some minimal level his analysis of the evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (citing *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)).

The Seventh Circuit has addressed the nature of fibromyalgia as a severe impairment in *Sarchet v. Chater*. Fibromyalgia "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness." 78 F.3d 305, 306 (7th Cir. 1996); *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998)(defining fibromyalgia as "a syndrome involving chronic widespread and diffuse pain throughout the entire body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep."); *see also* SSR 99-2p n.3 (discussing fibromyalgia).

Fibromyalgia alone is usually not a disabling condition. *See Sarchet*, 78 F.3d at 307. But Plaintiff does not contend the diagnosis of fibromyalgia alone was enough for a finding of disability, but, rather, the diagnosis was a medical impairment the ALJ was required to discuss. I agree. Remand is required under these circumstances because the ALJ failed to make any assessment of the medical evidence relating to fibromyalgia and instead suggested an absence of evidence to corroborate Plaintiff's complaints of pain. In fact, the word "fibromyalgia" does not even appear in the ALJ's decision. Without putting his consideration into writing, there is no way to know if, or how, the ALJ considered Plaintiff's fibromyalgia, and remand is required to address this deficiency.

11

The Commissioner tries to avoid this conclusion by arguing the basis for the fibromyalgia diagnosis is not clear. Yet, a neurologist, Dr. Santillan, and a rheumatologist, Dr. Davis, both diagnosed Plaintiff with fibromyalgia after examining her. (Tr. 597, 653.) And as already discussed, there is no laboratory test or exam for fibromyalgia. The Seventh Circuit has noted that even where objective medical evidence of the limitations in question was "very sparse," the ALJ was not free to dismiss the alleged impairment "without explaining why he reached that conclusion in a manner sufficient to permit an informed review." *Herron*, 19 F.3d at 334 (citations omitted). The Commissioner's arguments accordingly do not save the omissions in the ALJ's decision.

Plaintiff also alleges the ALJ failed to evaluate properly the evidence of her urinary stress incontinence. For an impairment to be considered disabling, it must "be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ concluded Plaintiff's incontinence did not meet the 12-month requirement to be considered a severe impairment. (Tr. 65.) But a review of the record shows Plaintiff first complained of urinary problems in September 2008 and stated the problems had been going on for some time. (Tr. 479.) This covers a 20 month time period. Accordingly, the ALJ's assertion the problem could not be considered severe due to the durational requirement is not based on substantial evidence.

The Commissioner contends this error does not matter as the RFC finding was nonetheless compatible with the limitations opined by treating urologist Dr. Yap. Dr. Yap opined that in an eight-hour workday Plaintiff would need six or seven bathroom breaks, each lasting two-to-five minutes. (Tr. 795.) The Commissioner contends that limitation is generally compatible with the

12

ALJ's allowance that Plaintiff be off-task five-percent of the time, in addition to normal breaks. (Tr. 63.) Dr. Yap also indicated that Plaintiff's symptoms would interfere with her attention and concentration. (Tr. 793.) The Commissioner contends that limitation is generally compatible with the ALJ's restriction of only simple, routine tasks. (Tr. 63.)

But the ALJ took no effort to explain why Plaintiff would be off task 5% of the time. Given the inadequate explanation, the Commissioner (and this Court) cannot simply assume the 5% off task allowance would allow Plaintiff to take the restroom breaks necessary. Indeed, the Commissioner also argues Plaintiff would be off task 5% of the time due to her concentration problems stemming from her mental health. (Comm. Br. at 4.) If so, then the ALJ's RFC wholly fails to address an additional 5–10% for restroom breaks and accidents. As the ALJ failed to explain this limitation in any discernible manner, the decision is remanded on this ground as well.

**2. Treating Physicians Rule**

Plaintiff next contends the ALJ did not give the proper weight to Dr. Dierschke's opinion given the length and frequency of his treatment. (ECF No. 12 at 13.) Typically, under the regulations, more weight is given to the opinion of treating physicians because of their greater familiarity with a claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). But an ALJ need not give controlling weight to a treating physician's opinion when that opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is [] inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). If an ALJ finds that a treating source is not entitled to controlling weight, the ALJ weighs the treating source opinion with a number of factors, two of which are supportability and consistency with the evidence. 20 C.F.R. § 404.1527(d)(3), (4). An ALJ may reasonably give less weight to

13

a treating physician's assessment that is internally inconsistent. *See Skarbek v. Barnhart*, 390 F.3d 500, 503–504 (7th Cir. 2004).

The record shows Plaintiff had 25 appointments with Dr. Dierschke since their initial consultation in January 2007. (Tr. 226–48, 447–80, 510–41, 798–800, 845–52.) Drs. Leonard and Vasudevan saw Plaintiff once each. In contrast to Drs. Callear, Leonard, and Vasudevan, Dr. Dierschke opined in a report that Plaintiff would need to miss more than four days of work per month, could only sit for fifteen minutes at a time, and could only stand for fifteen minutes at a time, along with other restrictions. (Tr. 602–604.) However, in that same report, Dr. Dierschke also wrote that Plaintiff had "pain of at least moderate degree." (Tr. 603.) The Commissioner argues from this that the ALJ acted reasonably as "moderate" pain is inconsistent with the serious limitations discussed. But Dr. Dierschke did not say the pain was moderate but rather of "*at least*" moderate degree. According to Dr. Dierschke's records Tapia rated her pain as a 7–8/10 twenty-two times, twice as a 6–7/10, and once as 8–9/10. (Tr. 244, 266, 229, 232, 238, 360, 441.) The National Institutes of Health consider a pain rating of 4–6 as moderate pain, which can interfere significantly with activities of daily living; and 7–10 as severe pain, which is considered disabling and a person experiencing pain at this level is unable to perform activities of daily living. National Institutes of Health, Pain Intensity Instruments, http://painconsortium.nih.gov/pain_scales/NumericRatingScale.pdf, (last visited July 20, 2012.) Dr. Dierschke's assessment of pain of at least a moderate degree is consistent with the overall reports from Plaintiff. At all of her appointments Plaintiff was reporting suffering from at least

14

moderate pain.[1] Dr. Dierschke's opinion was not inconsistent in this regard and the ALJ erred in dismissing it as such.

Plaintiff also contends the ALJ erred with respect to the opinions of Dr. Castillo. Dr. Castillo thought Plaintiff had unlimited/very good functioning in nine work activities, and had satisfactory functioning in four others. (Tr. 825–26.) However, Dr. Castillo opined that Plaintiff was limited in her ability to deal with work stresses, so the ALJ limited her to low stress work. (Tr. 63, 825.) Similarly, Dr. Castillo opined that Plaintiff was limited in her ability to respond appropriately to changes in the work setting, so the ALJ limited Plaintiff to only occasional changes in her work environment. (Tr. 63, 826.) Dr. Castillo also believed Plaintiff was limited in her ability to maintain attention/concentration for extended periods, perform at a consistent pace, complete a normal workweek without interruption, and demonstrate reliability. (Tr. 825–26.)

According to the Commissioner, "the ALJ's findings were generally consistent with Dr. Castillo's opinion." (Def. Br. at 5.) The Commissioner rests this conclusion on the fact that the ALJ restricted Plaintiff to simple, repetitive tasks, where she could be off-task five percent of the time (in addition to her normal work breaks). (Tr. 63.) However, as noted above, it is somewhat unclear for what purpose the ALJ was providing the five percent off-task measure as he did not detail what specific limitation or limitations he believed this was addressing. Additionally, there is a critical difference between Dr. Castillo's opinion and the RFC given by the ALJ, as evidenced by the testimony of the VE stating Plaintiff would not be employable given Dr. Castillo's opinion.

---

[1] The ALJ stated that instead he gave weight to the opinion of Dr. Vasudevan, finding his opinion "consistent with the above described residual functional capacity finding." (Tr. 64.) But Dr. Vasudevan found Tapia "requires no restrictions" and "[n]o permanent restrictions are required." (Tr. 347–48.) This inconsistency is problematic and was not adequately explained in the ALJ's decision.

15

(Tr. 51.) Furthermore, the ALJ did not address the weight he assigned to Dr. Castillo's opinion. Since Dr. Castillo is a long-term treatment provider, his opinion is presumed to be given controlling weight under the treating source rule. SSR 96-2p. There are no contrary opinions of mental health specialists in the file other than the opinions of the non-examining state agency psychologists. Even if the controlling weight presumption were not applicable, there is no explanation of what weight was actually given to the opinion as required by the Social Security rules. SSR 96-2p. Because there was no discussion of any lesser weight given to Dr. Castillo's opinion, the ALJ should have accepted it as controlling and included Dr. Castillo's limitations in the RFC. Alternatively, had the ALJ not accepted Dr. Castillo's opinions as having controlling weight, he should have discussed his reasons for the departure. He did neither and accordingly this was in error.

Finally, Plaintiff contends the ALJ erred in his (lack of) discussion of the weight he afforded Dr. Yap's opinion. Dr. Yap had been treating Plaintiff from November 2008 until at least February 2010. (Tr. 492, 777.) Dr. Yap's treatment records show Plaintiff's ongoing problems with urinary incontinence and the various treatment options explored, including medication, injections, and surgery. (Tr. 678, 693, 782–84.) But the ALJ's discussion of Plaintiff's urinary problems is limited to her hearing testimony only. (Tr. 65.) No mention of Dr. Yap is ever made. "[I]n deciding whether an individual is disabled, the adjudicator will always consider the medical opinions in the case record together with the rest of the relevant evidence." SSR 96-6p (discussing 20 C.F.R. § 404.1527 and § 416.927). The ALJ failed his duty to address Dr. Yap's opinion, in which he listed several limitations Plaintiff would face in a work environment, specifically the need for multiple unscheduled breaks. (Tr. 792–97.) At no point in the ALJ's decision or questioning

16

of the VE are these limitations addressed. (Tr. 35–36, 60–66.) "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. As discussed above with the RFC limitations, this was in error and the case must be remanded to correct for this.

**3. Credibility Determination**

Finally, Plaintiff contends the ALJ erred in his credibility determination and that the determination was not supported by substantial evidence. Plaintiff first points to the ALJ's use of the following statement:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 64.) This sentence, or one like it, has been criticized by the Seventh Circuit as "opaque," "meaningless," and "unsustainable." *Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011).

But the use of this sentence, in and of itself, does not render a credibility determination per se inappropriate. Rather, it is the use of the boilerplate without any other explanation that the Seventh Circuit has criticized: "The ALJ declared this testimony 'not entirely credible,' but we have said already that this *unexplained* finding is unsustainable." *Punzio*, 630 F.3d 704 at 709 (emphasis added). And in a recent unpublished decision, the Court reiterated that "[w]e have derided this sort of boilerplate as inadequate, *by itself*, to support a credibility finding." *Richison*

*v. Astrue*, No. 11-2274, 2012 WL 377674, at *3 (7th Cir. Feb. 7, 2012) (emphasis added). The court went on to note that "in this case the ALJ said more," and affirmed the ALJ's decision. *Id.*

In this case, too, the ALJ said more. He considered the objective medical evidence, Plaintiff's activities, treatment history, and allegations, as well as the opinions of Drs. Callear, Leonard, and Vasudevan, and explained how they supported his decision. (Tr. 63–64.) The credibility assessment was thus in line with precedent and this is not a ground for remand.

## CONCLUSION

In sum, the case is **REMANDED** to the Commissioner to allow the ALJ to address Plaintiff's fibromyalgia and urinary stress incontinence and, if necessary, incorporate any resulting limitations into an RFC assessment. The ALJ additionally erred in failing to give controlling weight to several of Plaintiff's doctors' opinions (or explain his divergence from said opinions) and properly evaluate other opinion evidence as required by SSA's rulings and regulations; the case is remanded on this ground as well.

**SO ORDERED** this   26th   day of July, 2012.

       s/ William C. Griesbach
       William C. Griesbach
       United States District Judge